IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

AVERY R. TYLER,

                    Petitioner,

          vs.

SCOTT FRAKES,

                    Respondent.

**8:19CV170**

**MEMORANDUM
AND ORDER**

This matter is before the court on Petitioner Avery R. Tyler's ("Petitioner" or "Tyler") Petition for Writ of Habeas Corpus. (Filing 1.) For the reasons that follow, Petitioner's habeas petition is denied and dismissed with prejudice.

## I.  CLAIMS

Summarized and condensed,[1] and as set forth in the court's prior progression order (filing 4), Petitioner asserted the following claims[2] that were potentially cognizable in this court:

Claim One:          Petitioner was denied the effective assistance of counsel because counsel failed to object to and appeal prosecutorial misconduct for (1) allowing Ronald King's

---

[1] Petitioner did not object to the court's summary and condensation.

[2] The court noted that, to the extent Petitioner framed his claims as a challenge to the Nebraska Supreme Court's decision affirming the state district court's denial of an evidentiary hearing and dismissal of Petitioner's motion for postconviction relief, such claims were not cognizable in a federal habeas action as they are based on errors in the state postconviction proceedings. (Filing 4.) *See Jenkins v. Houston*, 4:05CV3099, 2006 WL 126632 (D. Neb. 2006) (errors during state postconviction review are not cognizable in a federal habeas corpus action) (collecting cases).

1

known false testimony to go uncorrected and (2) vouching for and bolstering witness Ronald King. (Filing 1 at CM/ECF pp. 5, 7.)

Claim Two:      Petitioner was denied due process and the constitutional right to a fair trial because the prosecutor committed misconduct when she represented that a witness was not eligible for a plea deal and later provided the witness with a deal. (Filing 1 at CM/ECF p. 8.)

Claim Three:    Petitioner was denied the effective assistance of counsel *because* counsel failed "to correct known false testimony and question the witness [Ronald King] in relation to his claim that he was sorry for his comments to the police and that he didn't want to loose [sic] everything, and that he didn't see the shooting." (Filing 1 at CM/ECF p. 12.)

## II. BACKGROUND

### A. Convictions and Sentences

The court states the facts as they were recited by the Nebraska Supreme Court on postconviction appeal in *State v. Tyler*, 918 N.W.2d 306 (Neb. 2018) (filing 6-4).[3] *See Bucklew v. Luebbers*, 436 F.3d 1010, 1013 (8th Cir. 2006) (utilizing state court's recitation of facts on review of federal habeas petition).

---

[3] The recitation of facts contains minor variations from the Nebraska Supreme Court's postconviction appeal opinion and some additional information taken from the Nebraska Supreme Court's opinion on direct appeal in *State v. Tyler*, 870 N.W.2d 119 (Neb. 2015) (filing 6-3).

## 1. Facts

On September 3, 2012, Delayno Wright was shot and killed outside Halo Ultra Lounge (Halo) in Omaha, Nebraska. Prior to the shooting, Wright, his girlfriend Brittany Ashline, and his cousin LaRoy Rivers were walking through the parking lot toward Wright's vehicle when two men walked past them. One of the men grabbed or brushed against Ashline, which led to Ashline and Wright's confronting the men. Rivers thought he recognized one of the men who was wearing a brown, striped shirt and saw that man break away from the group. Rivers saw a dome light turn on in a vehicle in the parking lot, heard the voice of the man he thought he recognized yelling, "'What's up now?'" and heard gunshots. Rivers could not see the shooter, but Ashline said she saw a man run to a tan or gold sport utility vehicle or Jeep and leave the scene after the shots were fired. Wright indicated he had been shot, was driven to a hospital, and was subsequently pronounced dead due to a gunshot wound to his torso.

When Rivers spoke to investigators, he informed them that he thought he recognized the man wearing the brown, striped shirt as a person he played basketball with in high school. Rivers explained that he thought the man's first name was Avery, but that he was unsure of his last name. While on a detective's computer, Rivers accessed a social media page, viewed Tyler's profile picture, and identified him as the individual in the brown, striped shirt.

During the investigation of the shooting, investigators obtained a photograph of Tyler from a wedding he attended the day before the shooting in which he was wearing a brown, striped shirt. Investigators also obtained security footage showing a sport utility vehicle leaving the scene near the time of the shooting at a high rate of speed. It was subsequently discovered Tyler's girlfriend owned a silver Jeep Commander. At the scene of the shooting, investigators found eight shell casings. A crime laboratory technician reported that the casings were all fired from the same gun and that there are about 20 guns capable of firing them, including an "FN Five-

3

seveN" pistol. It was discovered Tyler had purchased an FN Five-seveN pistol approximately 2 ½ months prior to the shooting.

Investigators obtained and executed four search warrants for Tyler's car and for his grandparents', mother's, and girlfriend's residences. During the searches, investigators discovered a cell phone from Tyler's car, a gunlock bearing the "FN" logo from his grandparents' residence, and a letter from his mother's residence. Tyler signed a consent form that allowed investigators to download and search the contents of the cell phone. On the cell phone, investigators discovered another picture of the September 2, 2012, wedding in which Tyler was wearing a brown, striped shirt; a deleted text message from September 2 that read, "What's it like and where is halo?"; and call records and location information.

Based upon this information, Tyler was arrested and charged with murder in the first degree and use of a firearm to commit a felony for the death of Wright.

## 2. Trial

A jury trial was held in June 2014. At trial, the court heard testimony from 24 witnesses for the State and 5 for the defense. Among the State's witnesses were Ronald King and Jelani Johnson. A summary of their testimony and the State's arguments concerning their testimony is provided in relevant part below.

### (a) King's Testimony

King testified he met Tyler and Johnson playing basketball for Bellevue University in Nebraska from 2008 to 2010. After those 2 years, King moved back to his hometown in Illinois.

In September 2012, King returned to Nebraska for the wedding of a former teammate and stayed with Johnson who was also attending the wedding. King testified that Tyler attended the wedding and was wearing a brown, striped shirt.

4

King testified that he left the wedding to go to Halo with Tyler in the vehicle Tyler was driving, a "light-colored Jeep." King explained that once they got to Halo, they parked in the parking lot and were walking on a sidewalk leading into the club when they passed two men and a woman. King testified that he brushed against the woman as she was walking by and that the woman and one of the men confronted them about the contact. King explained that Tyler and the man who confronted them got into a heated exchange and that the other man and King had to separate the two. King testified that Tyler left at some point and that when King walked back toward Tyler's Jeep, he saw Tyler walking from the Jeep toward the location where the confrontation happened with something in his hand. King testified he saw Tyler fire three to five gunshots in the direction where King had last seen the group of three people. After firing the shots, King testified that Tyler returned to the vehicle and Tyler drove them to a second bar. King then texted another friend for a ride and parted ways with Tyler. King testified that he returned to Illinois on his scheduled return flight. Later, King was arrested in Illinois for an unrelated matter and held for a Nebraska warrant. King obtained a lawyer when Omaha Police Department detectives began to question him about the shooting. Eventually, he was given immunity. King explained the terms of the immunity by describing that he gave a formal interview to the police and that if called to testify, he would "have to say the exact same thing."

During cross-examination, King was asked by Tyler's counsel to look at a letter leading to the following exchange:

Q. Do you recognize [the letter]?

A. Yes.

Q. Is it something that you authored, you wrote it?

A. Yes.

Q. When?

A. I don't believe that I wrote it. I probably was speaking and somebody else wrote it.

Q. Okay. What were the circumstances of you making those statements and giving that information?

A. You know, just follow-up on my reactions and how I felt about the situation.

Q. Okay. Was it before you spoke to the cops or after you spoke to the cops?

A. After.

Q. And who—you say you don't think you typed it, someone else did?

A. Yes.

Q. Who?

A. My attorney, possibly.

Q. Well, what do you mean "possibly?"

A. I don't remember who wrote it.

Q. Okay. But it's your words?

A. Yes.

Q. And you say this was done after the police spoke to you in Illinois?

A. Correct.

The letter was not offered into evidence, and King provided no other testimony concerning the letter outside of this exchange. However, Tyler attached a letter to his motion for postconviction relief and alleged the document was the letter his counsel questioned King about at trial. Tyler alleges his trial counsel was informed by the State during an off-the-record recess that the letter discussed was

6

actually written by Johnson. Neither the State nor Tyler's trial counsel disclosed to the jury that Johnson had authored the letter.

### (b)  Johnson's Testimony

Johnson testified he has known Tyler since childhood. Johnson played basketball at Bellevue University with Tyler and King and asserted that he is friends with both men.

On September 2, 2012, King and Johnson attended a wedding where they saw Tyler. King and Tyler left the wedding reception without Johnson, and Johnson did not see King again until the next day. The next morning, Johnson had a conversation with King about what had occurred the night before. Tyler showed up uninvited at Johnson's house, where he talked to Johnson and had a private conversation with King.

Johnson testified that days after the wedding, Tyler came to the restaurant where Johnson worked and told Johnson that Tyler's property had been searched by police. Tyler also told him that "his car couldn't be placed at Halo that night," to which Johnson agreed. Johnson further testified that after the meeting at Johnson's workplace, Tyler again came over to Johnson's house and used Johnson's cell phone to call King.

In October 2012, Omaha Police Department detectives initiated an interview with Johnson. Johnson testified that during the interview, detectives questioned him about the night of the wedding and Johnson lied and told them King had driven his car from the wedding and had come back to pick him up later. A couple weeks after this initial interview, detectives again attempted to interview Johnson. Johnson declined to talk with the detectives without an attorney and was charged with accessory to a felony. After Johnson hired an attorney, another interview was set up and Johnson admitted that King did not take his car the night of the wedding and that King did not return later to pick him up.

At trial, Johnson was questioned concerning whether he had a plea agreement. On direct examination, the following exchange occurred:

> Q. Are you testifying here today pursuant to any type of agreement with the Douglas County Attorney's Office?
>
> A. Are you asking if I do have an agreement?
>
> Q. Yes.
>
> A. No.
>
> Q. Okay. Has there been any type of plea agreement entered into between you and the Douglas County Attorney's Office regarding this case?
>
> A. No.
>
> Q. Is there any reason why you haven't already pled to this charge?
>
> A. I mean, I had conversations with my lawyer, and he told me just by coming . . . forth and being truthful that that would be the best route.

On cross-examination, Johnson again testified that he did not have a plea agreement worked out in exchange for his testimony. Johnson explained that after consulting with his attorney, he believed coming forward and being truthful would be the best thing to do. Johnson believed that testifying truthfully would lead to a lesser charge or a dismissal of the accessory charge.

### (c)  State's Closing Argument

In the State's closing argument, the State addressed both King's and Johnson's testimony and stated, in relevant part:

> King and . . . Johnson were put in a bad place. Their teammate and their friend did something very bad. He told them to be quiet about it. He

8

told them to lie about it. When . . . King is approached by the police, sure, he's scared. He's worried he's going to get arrested. He was at a crime scene, a very serious crime scene, one where someone was killed, and he doesn't even bother calling the cops to tell them about it. He leaves the scene, doesn't tell anyone about it. He remains quiet. He was probably scared. He probably didn't want . . . Tyler to get in trouble because it's a friend of his.

So when he's in jail and the police want to talk to him, he wanted a deal. And [defense counsel] criticizes us for giving him that deal. But keep in mind what the police knew versus what . . . King knew. And what I would argue to you is the police and prosecutors don't give deals to liars. We didn't give a deal to . . . Johnson. In fact, the police arrested him and that charge is still pending. But what we knew about . . . King when he said, "Hey, I want immunity," frankly, it's easy to give it to him. Why? Because all the evidence was pointing to . . . Tyler being the shooter; Jeep Commander leaving the scene that we tied to his girlfriend; FN Herstal gun was the weapon used to kill, we tied that to . . . Tyler; we have a witness, not only identify him at the scene, telling the . . . police, not coincidentally, what he was wearing that night and a picture of him. We have cell phone evidence of him using his phone that night. There was nothing to suggest . . . King was the shooter, and the cops knew that. So to tell . . . King, "We aren't going to arrest you as long as you tell the truth," was simple, which is why it was different with [Johnson]. He didn't tell the truth, so he was arrested.

### 3.  Verdicts and Sentences

Tyler was convicted by a jury on both counts. The state district court sentenced Tyler to life in prison for the murder and 20 to 30 years' imprisonment for the firearm conviction.

## B.  Direct Appeal

Tyler appealed his convictions to the Nebraska Supreme Court. Tyler was represented by the same counsel on appeal as at trial. In his brief, Tyler assigned that the state district court erred in overruling his various motions to suppress. (Filing 6-

5 at CM/ECF pp. 6-7; *see also* Filing 6-3 at CM/ECF p. 7.) The Nebraska Supreme Court concluded that the state district court did not err by overruling Tyler's motions to suppress and affirmed Tylor's convictions. (Filing 6-3 at CM/ECF pp. 4, 8-14.) Tyler filed a petition for a writ of certiorari (filing 6-32), which was denied by the United States Supreme Court on February 29, 2016 (filing 6-33).

## C. Postconviction Action

On October 13, 2016, Tyler filed a verified motion for postconviction relief alleging prosecutorial misconduct and ineffective assistance of trial counsel. (Filing 6-12 at CM/ECF pp. 20-46.) As to prosecutorial misconduct, Tyler claimed the State (1) allowed King's known, false testimony concerning the authorship of the letter[4]

_____

[4] Tyler attached the letter to his postconviction motion. The letter reads:

First I want to say I'm sorry. I have put myself in a terrible situation and it makes me sick to my stomach to think that I could have ruined my life over something so stupid. I have never been questioned by the police before and quite honestly it scared me to even be in that situation. I was drug into this situation by people who I thought were my friends. I just want to move on with my life and put this whole situation behind me. I have worked and went to school and I am almost at the place that I want to be in my life and to lose all of that over something I did not do, did not see, or wasn't even involved with would not only devastate me but break my family's heart. They know that I am a good person and would never try to do the wrong thing intentionally. In this situation being too loyal has backfired. I have known Avery Tyler since elementary school where we played basketball together. He knows my family and I know his. In my wildest dreams I could never picture Avery hurting someone and I still do not want to believe it. He has always been a good friend of mine and I looked up to him as he was a great student athlete. He was the best teammate I could have asked for. He was a great student, got "A's" and always stayed on top of his schoolwork. And he is a great all around person. As a friend I really try to do anything I can to help my friends. I realize now that I hurt myself in the process.

10

provided by Tyler's counsel to go uncorrected; (2) introduced new and impermissible evidence during closing arguments in providing the reasoning for King's immunity deal; (3) improperly vouched for and bolstered King's testimony by stating during closing arguments that "'the police and prosecutors don't give deals to liars'"; (4) lied to the jury during closing arguments in representing that Johnson would not receive a deal; and (5) failed to disclose to Tyler's counsel that Johnson's charge would be dropped in exchange for his testimony at trial. (Filing 6-12 at CM/ECF pp. 25-33.) Tyler claimed that the cumulative effect of the prosecutorial misconduct deprived him of a fair trial. (Filing 6-12 at CM/ECF pp. 25, 33-34.) As to ineffective assistance, Tyler claimed trial counsel (1) allowed King's false testimony to go uncorrected, (2) failed to object to prosecutorial misconduct in introducing new and impermissible evidence during closing arguments and vouching for and bolstering a State's witness, and (3) failed to appeal the comments made by the county attorney. (Filing 6-12 at CM/ECF pp. 34-39.)

In an amended order, the state district court denied Tyler's motion without an evidentiary hearing. (Filing 6-12 at CM/ECF pp. 79-83.) The court found Tyler's claims were procedurally barred, insufficiently pled, and affirmatively refuted by the record. (Filing 6-12 at CM/ECF pp. 80-83.)

Tyler appealed to the Nebraska Supreme Court, assigning that the state district court erred in finding an evidentiary hearing was not warranted and (1) dismissing his claims of prosecutorial misconduct regarding King's and Johnson's testimony and the State's closing argument and (2) dismissing his claims of ineffective assistance of counsel for not objecting, correcting, or appealing the alleged prosecutorial misconduct. (Filing 6-7 at CM/ECF p. 9; *see also* Filing 6-4 at CM/ECF p. 7.)

In a published opinion filed October 19, 2018, the Nebraska Supreme Court affirmed the state district court's order, concluding that Tyler was not entitled to an

---

(Filing 6-12 at CM/ECF p. 41.)

evidentiary hearing on his claims of prosecutorial misconduct and ineffective assistance of counsel and that the state district court did not err in dismissing Tyler's motion for postconviction relief.[5] (Filing 6-4 at CM/ECF p. 16.) Tyler filed a motion for rehearing, which was overruled, and the mandate issued on February 4, 2019. (Filing 6-2 at CM/ECF p. 3.)

## D.  Habeas Petition

Tyler filed his Petition for Writ of Habeas Corpus in this court on April 18, 2019. (Filing 1.) He filed a brief in support of his habeas petition on June 3, 2019. (Filing 3.) In response to the Petition, Respondent filed an Answer (filing 7), a Brief (filing 8), and the relevant state court records (filing 6). Tyler filed a brief (filing 9) in response to Respondent's Answer, and Respondent filed a reply brief (filing 10). This matter is fully submitted for disposition.

## III.  OVERVIEW OF APPLICABLE LAW

A couple strands of federal habeas law intertwine in this case. They are (1) the deference that is owed to the state courts when a federal court reviews the factual or legal conclusions set forth in an opinion of a state court; and (2) the standard for evaluating a claim of ineffective assistance of counsel. The court elaborates upon those concepts next so that it may apply them later in a summary fashion as it reviews Tyler's claims.

## A.  Deferential Standard Under 28 U.S.C. § 2254(d)

When a state court has adjudicated a habeas petitioner's claim on the merits, there is a very limited and extremely deferential standard of review both as to the law and the facts. *See* 28 U.S.C. § 2254(d). Section 2254(d)(1) states that a federal court may grant a writ of habeas corpus if the state court's decision "was contrary

---

[5] The specific findings and conclusions of the Nebraska Supreme Court will be discussed as necessary below.

to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). As explained by the Supreme Court in *Williams v. Taylor*, 529 U.S. 362 (2000), a state court acts contrary to clearly established federal law if it applies a legal rule that contradicts the Supreme Court's prior holdings or if it reaches a different result from one of that Court's cases despite confronting indistinguishable facts. *Id.* at 405-06. Further, "it is not enough for [the court] to conclude that, in [its] independent judgment, [it] would have applied federal law differently from the state court; the state court's application must have been objectively unreasonable." *Rousan v. Roper*, 436 F.3d 951, 956 (8th Cir. 2006).

With regard to the deference owed to factual findings of a state court's decision, section 2254(d)(2) states that a federal court may grant a writ of habeas corpus if a state court proceeding "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). Additionally, a federal court must presume that a factual determination made by the state court is correct, unless the petitioner "rebut[s] the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

As the Supreme Court noted, "[i]f this standard is difficult to meet, that is because it was meant to be." *Harrington v. Richter*, 562 U.S. 86, 102 (2011). The deference due state court decisions "preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [Supreme Court] precedents." *Id.*

However, this high degree of deference only applies where a claim has been adjudicated on the merits by the state court. *See Brown v. Luebbers*, 371 F.3d 458, 460 (8th Cir. 2004) ("[A]s the language of the statute makes clear, there is a condition precedent that must be satisfied before we can apply the deferential AEDPA [Antiterrorism and Effective Death Penalty Act] standard to [the

petitioner's] claim. The claim must have been 'adjudicated on the merits' in state court.").

The Eighth Circuit clarified what it means for a claim to be adjudicated on the merits, finding that:

> AEDPA's requirement that a petitioner's claim be adjudicated on the merits by a state court is not an entitlement to a well-articulated or even a correct decision by a state court. Accordingly, the postconviction trial court's discussion of counsel's performance—combined with its express determination that the ineffective-assistance claim as a whole lacked merit—plainly suffices as an adjudication on the merits under AEDPA.

*Worthington v. Roper*, 631 F.3d 487, 496-97 (8th Cir. 2011) (internal quotation marks and citations omitted).

The court also determined that a federal court reviewing a habeas claim under AEDPA must "look through" the state court opinions and "apply AEDPA review to the 'last reasoned decision' of the state courts." *Id.* at 497. A district court should do "so regardless of whether the affirmance was reasoned as to some issues or was a summary denial of all claims." *Id.*

## B. The Especially Deferential *Strickland* Standard

When a petitioner asserts an ineffective assistance of counsel claim, the two-pronged standard of *Strickland v. Washington*, 466 U.S. 668 (1984), must be applied. The standard is very hard for offenders to satisfy.

*Strickland* requires that the petitioner demonstrate both that his counsel's performance was deficient, and that such deficient performance prejudiced the petitioner's defense. *Id.* at 687. The first prong of the *Strickland* test requires that the petitioner demonstrate that his attorney failed to provide reasonably effective assistance. *Id.* at 687-88. In conducting such a review, the courts "indulge a strong

presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689.

The second prong requires the petitioner to demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. Further, as set forth in *Strickland*, counsel's "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable" in a later habeas corpus action. *Id.* at 690.

Additionally, the Supreme Court has emphasized that the deference due the state courts applies with special vigor to decisions involving ineffective assistance of counsel claims. *Knowles v. Mirzayance*, 556 U.S. 111 (2009). In *Knowles*, the Justices stressed that under the *Strickland* standard, the state courts have a great deal of "latitude" and "leeway," which presents a "substantially higher threshold" for a federal habeas petitioner to overcome. As stated in *Knowles*:

> The question is not whether a federal court believes the state court's determination under the *Strickland* standard was incorrect but whether that determination was unreasonable—a substantially higher threshold. And, because the *Strickland* standard is a general standard, a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard.

*Id.* at 123 (internal quotation marks and citations omitted).

*Strickland* applies equally to appellate counsel, and appellate counsel is entitled to the "benefit of the doubt." *Woods v. Etherton*, 136 S. Ct. 1149, 1153 (2016). To demonstrate prejudice on account of appellate counsel's failure to raise a claim on appeal, a petitioner must show a "reasonable probability that an appeal of [the] issue would have been successful and that the result of the appeal would thereby have been different." *Pryor v. Norris*, 103 F.3d 710, 714 (8th Cir. 1997). The petitioner must show more than that the alleged error had some conceivable

effect on the outcome of the proceeding. *Id.* at 713. "'Virtually every act or omission of counsel would meet that test, and not every error that conceivably could have influenced the outcome undermines the reliability of the result of the proceeding.'" *Id.* (quoting *Strickland*, 466 U.S. at 693).

## IV. DISCUSSION

### A. Claim One, Subpart (1), and Claim Three

In Claim One, Subpart (1), Tyler argues that he was denied the effective assistance of counsel because counsel failed to object to and appeal prosecutorial misconduct for allowing Ronald King's known false testimony to go uncorrected. (Filing 1 at CM/ECF p. 5.) Relatedly, in Claim Three, Tyler asserts that he was denied the effective assistance of counsel because counsel failed "to correct known false testimony and question the witness [Ronald King] in relation to his claim that he was sorry for his comments to the police and that he didn't want to loose [sic] everything, and that he didn't see the shooting." (Filing 1 at CM/ECF p. 12.) Both these claims relate to King's testimony regarding the letter attached to Tyler's postconviction appeal. (Filing 6-12 at CM/ECF p. 41.) In its opinion on postconviction appeal, the Nebraska Supreme Court addressed and rejected these claims on the merits. In so doing, the Nebraska Supreme Court stated:

> In his motion for postconviction relief, Tyler alleged his counsel was ineffective for failing to correct King's known, false testimony that King authored the letter and, on direct appeal, in failing to allege prosecutorial misconduct that the State allowed known, false testimony to go uncorrected. This claim is without merit, because Tyler has failed to allege sufficient facts to show King's testimony misled or unduly influenced the jury.
>
> Tyler contends that correcting the testimony about the letter would have provided the jury evidence relevant to King's credibility which was at issue as a primary witness for the State. However, Tyler's counsel cross-examined King at trial and questioned King's credibility,

including the amount of alcohol he consumed on the day of the shooting, his receiving immunity for his cooperation, and his statements to law enforcement. The jury was able to compare King's testimony with the other witnesses' accounts and consider the terms of King's immunity deal. The authorship of a letter that the jury did not review or have substantive information about had little probative value to King's credibility. Tyler failed to show how evidence that King authored the letter caused any prejudicial effect.

Tyler also claims his counsel should have introduced the letter to impeach King's testimony that he saw Tyler firing the gun, because the letter allegedly states that the author did not see the shooting. However, Tyler admits that the letter was actually written by Johnson, so regardless of the alleged content of the letter, any statements about what the author of the letter observed are irrelevant to King's testimony about his own observations.

Therefore, based on all of the above, Tyler has failed to state sufficient allegations under the prejudice prong of *Strickland* to show that, but for counsel's failure to correct King's testimony about the letter and failure to allege on direct appeal that the State committed prosecutorial misconduct in not correcting King's testimony, the result of trial would have been different.

(Filing 6-4 at CM/ECF pp. 12-13.)

Tyler argues that the Nebraska Supreme Court's decision ignores the fact that King's testimony that he saw Tyler firing the gun was false. (Filing 9.) Specifically, Tyler alleges that King admitted that he had lied to the police and that he never saw the shooting. (Filing 9.) Tyler bases this allegation on the statements in the letter attached to his postconviction motion. (Filing 9; Filing 6-12 at CM/ECF p. 41.) But, as Tyler acknowledged in his postconviction motion, the letter was written by Johnson, not King. (Filing 6-12 at CM/ECF pp. 25-27.) Furthermore, beyond King's admission that he did not write the letter (filing 6-12 at CM/ECF pp. 25-27), the evidence introduced at trial supports the fact that Johnson authored the letter. On cross-examination, trial counsel showed the letter to Johnson and he testified that he

wrote the letter before his second interview with law enforcement.[6] (Filing 6-27 at CM/ECF pp. 54-55.) The statements in the letter further show that it was written by Johnson and not King. For example, the statements—"I have known Avery Tyler since elementary school where we played basketball together" and "I have worked and went to school and I am almost at the place that I want to be in my life and to lose all of that over something I did not do, did not see, or wasn't even involved with would not only devastate me but break my family's heart" (filing 6-12 at CM/ECF p. 41)—are consistent with Johnson's trial testimony that he was not at Halo on the night of the shooting (filing 6-26 at CM/ECF pp. 95-97) and that he had been friends with Tyler since childhood when they played basketball together (filing 6-26 at CM/ECF pp. 77-78). King, on the other hand, testified that he met Tyler when they played basketball together at Bellevue University from 2008 to 2010, which were the only two years King lived in Nebraska. (Filing 6-23 at CM/ECF pp. 4-7.)

Because the record establishes that Johnson, not King, authored the letter, Tyler's reliance on the letter to assert that King falsely testified that he saw Tyler firing the gun is misplaced. The court finds that the Nebraska Supreme Court's conclusion—that any statements about what the author of the letter observed were irrelevant to King's testimony about his own observations—was not based on an unreasonable determination of the facts in light of the evidence. Thus, trial counsel was not ineffective for failing to use the statements in the letter to impeach King. Moreover, the Nebraska Supreme Court's decision was not contrary to, or an unreasonable application of, clearly established federal law.

Furthermore, the court finds that the Nebraska Supreme Court reasonably applied *Strickland*'s prejudice prong in concluding that counsel's performance with respect to King's testimony regarding authorship of the letter did not constitute ineffective assistance of counsel. Although trial counsel decided not to correct or impeach King's testimony that he authored the letter, trial counsel called into doubt

---

[6] Although the letter was not offered into evidence, trial counsel quoted a portion of it when questioning Johnson. (Filing 6-27 at CM/ECF pp. 54-55.)

King's credibility during cross-examination with other evidence, including the amount of alcohol he consumed on the day of the shooting, his receiving immunity for his cooperation, and his statements to law enforcement. This is not a case in which the defense offered little or no other evidence raising doubts about King's credibility such that the failure to correct or impeach King's testimony that he authored the letter might have played a larger role. Correcting Tyler's claim to authorship of the letter which the jury did not review or have substantive information about would have had minimal probative value to King's credibility. Because the testimony that King authored the letter had no prejudicial effect, the Nebraska Supreme Court determined that Tyler failed to show that, but for counsel's failure to correct King's testimony about the letter and failure to allege on direct appeal that the State committed prosecutorial misconduct in not correcting King's testimony, the result of trial would have been different. The Nebraska Supreme Court's decision was not contrary to, or an unreasonable application of, *Strickland* or any other clearly established federal law, nor was it based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. *See, e.g.*, *United States v. Conrad*, 320 F.3d. 851, 855 (8th Cir. 2003) (to establish prosecutorial misconduct, a petitioner must show the conduct was improper and prejudicially affected substantial rights so as to deprive defendant of a fair trial); *Garrett v. United States*, 78 F.3d 1296, 1305 (8th Cir. 1996) ("It is true that if there is no merit to a claim, failure to raise it on appeal does not result in ineffective assistance under *Strickland*.").

Accordingly, Claim One, Subpart (1), and Claim Three are denied.

## B.  Claim One, Subpart (2)

In Claim One, Subpart (2), Tyler asserts that he was denied the effective assistance of counsel because counsel failed to object to and appeal prosecutorial misconduct for vouching for and bolstering witness Ronald King. The Nebraska Supreme Court considered and rejected the claim on postconviction appeal as follows:

Tyler claims his counsel was ineffective for failing to object to the State's improperly bolstering King's testimony. Specifically, Tyler points to the State's comment that "the police and prosecutors don't give deals to liars" while noting King received an immunity deal as opposed to Johnson, who did not. Such a statement, Tyler argues, implied that King must be honest because he got an immunity deal.

The trial testimony of both King and Johnson support the State's comments in closing. King testified that he was approached by investigators, that he demanded an immunity deal in exchange for an interview, and that he received the deal. Johnson, in turn, testified that he lied to investigators, that he was charged with accessory to a felony, and that he did not have a deal at the time of trial. The inferences made by the State were reasonable given these facts.

In addition, the jury was able to determine on its own the weight and credibility to be given to King's testimony as it heard King testify, heard King being cross-examined as to his credibility, heard testimony from other witnesses concerning King, and heard Tyler's closing argument which addressed concerns about King's truthfulness.

Further, the prosecutor's statement was made in the State's rebuttal argument. In *U.S. v. Delgado*, the court held that the prosecutor did not commit misconduct by arguing during closing arguments that the defendant had lied. The court noted that "context is crucial" and that the prosecutor's statement was made in response to defense counsel's attack of government witnesses and after a detailed summary of the evidence. The statement that the defendant lied, the court explained, was a commentary on what the evidence showed; it was not an assertion of the prosecutor's personal opinion or an attack on the defendant's character.

Here, Tyler's counsel, during closing, raised the issue of King's credibility repeatedly. More specifically, Tyler's counsel questioned why King would need immunity if he had not done anything illegal. To rebut that contention, the prosecutor addressed the reason King was granted immunity and the reason Johnson was not granted immunity. The prosecutor's statement was a commentary on what the evidence showed; it was not an assertion of the prosecutor's personal opinion or a bolstering of King's credibility.

20

Lastly, the trial judge instructed the jury that the attorneys' statements were not to be taken as evidence. Therefore, absent other evidence, the State's comment that "the police and prosecutors don't give deals to liars" and the State's emphasis on King's having received an immunity deal does not amount to prosecutorial misconduct. Counsel is not ineffective for failing to make an objection that has no merit. As a result, Tyler's trial counsel could not be ineffective for failing to object.

(Filing 6-4 at CM/ECF pp. 14-15 (footnotes omitted).)

"A prosecutor must limit the closing argument to the evidence and the reasonable inferences that may be drawn from it." *United States v. Eagle*, 515 F.3d 794, 805 (8th Cir. 2008). The prosecutor is entitled to rebut defense attacks on witness credibility. *United States v. Collins*, 642 F.3d 654, 657 (8th Cir. 2011). However, "[i]mproper vouching occurs when a prosecutor refers to facts outside the record, implies that the witness's testimony is supported by facts not available to the jury, gives an implied guarantee of truthfulness, or expresses a personal opinion regarding witness credibility." *United States v. Beaman*, 361 F.3d 1061, 1065 (8th Cir. 2004).

In short, the Nebraska Supreme Court reasonably applied federal law when it determined that the prosecutor's comment was not improper "vouching" and did not constitute prosecutorial misconduct, but rather was a reference to the evidence at trial, a reasonable inference from the evidence, and a response to closing argument by Tyler's counsel. Based on that finding, it concluded that trial counsel was not ineffective for failing to object to the prosecutor's comment. *See Gray v. Bowersox*, 281 F.3d 749, 756 n.3 (8th Cir. 2002) ("[B]ecause the underlying objection would have been without merit, a claim of ineffective assistance is not viable."). The Nebraska Supreme Court's ruling was not based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding, nor was it contrary to, or an unreasonable application of, *Strickland* or other federal law. Furthermore, because there was no merit to Tyler's prosecutorial misconduct claim, counsel's failure to raise that claim on appeal cannot constitute ineffective assistance

21

of counsel. *See Garrett*, 78 F.3d at 1305. Accordingly, Tyler is not entitled to habeas relief on Claim One, Subpart (2).

## C.  Claim Two

In Claim Two, Tyler alleges that he was denied due process and the constitutional right to a fair trial because the prosecutor committed misconduct when she represented that a witness (Johnson) was not eligible for a plea deal and later provided the witness with a deal. (Filing 1 at CM/ECF p. 8.)

On postconviction appeal, Tyler raised this claim as both prosecutorial misconduct and a violation of *Brady v. Maryland*, 373 U.S. 83 (1963). The court construes Claim Two as raising the same grounds Tyler asserted in the Nebraska state courts. (*See* Filing 3 at 9.) The Nebraska Supreme Court addressed and rejected the claim as follows:

> Tyler claims that the State committed prosecutorial misconduct in failing to disclose to the jury that Johnson had received a plea deal. Tyler also claims that the State committed a violation of *Brady* when it failed to disclose that Johnson had received a plea deal.

> These claims center on Tyler's allegation that the prosecutor told the jury during his closing argument that Johnson would not be getting a deal and that after trial, Johnson had his criminal case dismissed as a result of his testimony. A determination of these claims on the merits is possible based on the record without further evidentiary hearing.

> In assessing allegations of prosecutorial misconduct in closing arguments, a court first determines whether the prosecutor's remarks were improper. It is then necessary to determine the extent to which the improper remarks had a prejudicial effect on the defendant's right to a fair trial.

> A prosecutor must base his or her argument on the evidence introduced at trial rather than on matters not in evidence. However, a prosecutor is entitled to draw inferences from the evidence in presenting his or her

case, and such inferences generally do not amount to prosecutorial misconduct. As we stated in *State v. Dubray*:

> [W]hen a prosecutor's comments rest on reasonably drawn inferences from the evidence, he or she is permitted to present a spirited summation that a defense theory is illogical or unsupported by the evidence and to highlight the relative believability of witnesses for the State and the defense. These types of comments are a major purpose of summation, and they are distinguishable from attacking a defense counsel's personal character or stating a personal opinion about the character of a defendant or witness.

During trial, Johnson testified that he did not have a deal with the State but that he hoped his cooperation would lead to a lesser charge or dismissal of his accessory charge. In closing arguments, the State asserted that Johnson had been arrested, had a charge pending, and did not have a deal in place at the time of trial.

Even if Johnson later received a dismissal or reduction of his charge, it would not make Johnson's testimony or the State's assertions during closing arguments untrue. In fact, in review of Johnson's testimony and the State's assertions during closing arguments, the record makes clear that Johnson believed it possible and the State did not dispute that Johnson's charge or sentence might be modified as a result of his testimony. As such, the State's assertions during closing arguments did not mislead or unduly influence the jury. As we have previously stated, a prosecutor's conduct that does not mislead and unduly influence the jury does not constitute misconduct. Tyler's claim that the prosecutor misled the jury is without merit.

In regard to an alleged *Brady* violation, the U.S. Supreme Court has held that the prosecution has a duty to disclose all favorable evidence to a criminal defendant prior to trial. Favorable evidence includes both exculpatory and impeachment evidence.

Tyler's motion for postconviction relief alleges that the State committed the *Brady* violation when the State gave Johnson a plea deal after telling the jury that Johnson would not be given a deal. More specifically, Tyler alleges the prosecutor stated in closing that Johnson

would not be getting a deal and that therefore, the State was precluded from giving Johnson a deal after trial.

However, the record does not support this allegation. Instead, the record indicates that the prosecutor stated that "[w]e didn't give a deal to . . . Johnson." The prosecutor's statement was made during rebuttal argument in response to defense counsel's questioning as to why King wanted immunity. The prosecutor's statement was a correct statement of the evidence which indicated that Johnson lied to investigators, that he was charged with accessory to a felony, and that he did not have a deal at the time of trial.

Tyler's motion for postconviction relief did not allege that Johnson's testimony was false or that the State had a plea agreement with Johnson at the time of trial and failed to disclose that fact to Tyler. As a result, Tyler did not present allegations that the prosecution failed to disclose exculpatory or impeachment evidence to support a *Brady* violation. This assignment of error is without merit.

(Filing 6-4 at CM/ECF pp. 9-11 (footnotes omitted).)

A habeas petition will be granted for prosecutorial misconduct only when the misconduct "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)). The Eighth Circuit has construed the rule set forth in *Darden* as a two-part test for prosecutorial misconduct: (1) the prosecutor's remarks or conduct must have been improper, and (2) such remarks or conduct must have prejudicially affected the defendant's substantial rights so as to deprive the defendant of a fair trial. *Conrad*, 320 F.3d. at 855; *Young v. Bowersox*, 161 F.3d 1159, 1162 (8th Cir. 1998). If the reviewing court does not find the remarks to have been improper, the court does not reach the second step of determining whether they deprived the defendant of his constitutional right to due process. *Basile v. Bowersox*, 125 F. Supp. 2d 930, 941 (E.D. Mo. 1999).

Prosecutors are entitled to argue reasonable inferences to be drawn from the facts in evidence during closing arguments. *United States v. Karam*, 37 F.3d 1280,

1289 (8th Cir. 1994). Courts have found a prosecutor's conduct improper where the prosecutor "ma[de] improper insinuations and assertions calculated to mislead the jury during closing argument." *United States v. Johnson*, 968 F.2d 768, 770 (8th Cir. 1992). In addition, *Brady* requires the government to produce all material evidence, whether impeachment or exculpatory, *Giglio v. United States*, 405 U.S. 150, 154-55 (1972), in its possession that is favorable to the defendant. Evidence is material "only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *United States v. Bagley*, 473 U.S. 667, 682 (1985). Thus, to establish a *Brady* violation, a defendant is required to show that: (1) the prosecution suppressed evidence; (2) the evidence was favorable to the defendant; and (3) the evidence was material." *United States v. Tate*, 633 F.3d 624, 630 (8th Cir. 2011) (quotation omitted).

The Nebraska Supreme Court rejected Tyler's prosecutorial misconduct and *Brady* violation claims because the record refuted his factual allegations. The court's findings, which Tyler has not rebutted, accurately represent the trial court record. Specifically, the record reflects that Johnson had been arrested, had a charge pending, and did not have a deal in place at the time of trial. Thus, the prosecutor's remarks in closing to this effect were correct statements of the evidence and not misleading to the jury. That Johnson may have received some sort of deal after Tyler's trial does not render the prosecutor's statements in closing incorrect. Furthermore, Johnson testified, without objection, that although he did not have a deal with the State, he hoped his cooperation would lead to a lesser charge or dismissal of his accessory charge. Thus, the jury was aware of the possibility that Johnson could receive a favorable disposition of his criminal charge. Under these circumstances, Tyler was not deprived of a fair trial.

In addition, because the State had no plea agreement or deal with Johnson at the time he testified at Tyler's trial, there was no deal or agreement to disclose to Tyler and thus no evidence to support a *Brady* violation. That Johnson may have

received some sort of deal and favorable disposition of his criminal charge after Tyler's trial does not in itself establish that a *Brady* violation occurred. *See, e.g.*, *DeMarco v. United States*, 415 U.S. 449, 450 (1974) (whether a plea or cooperation agreement was "made after or before [a defendant's] trial" was "dispositive" in determining whether there was a *Giglio* violation); *United States v. Molina*, 75 F.3d 600, 602 (10th Cir. 1996) (noting that "[r]equiring the government to disclose potential plea agreements and offers of plea agreements would place an unreasonable burden on the government, and such offers are too speculative and uncertain to be material"); *United States v. Ramirez*, 608 F.2d 1261, 1266-67 (9th Cir. 1979) (the defendant was not deprived of a fair trial because of the government's alleged failure to disclose the advantage the witness was promised in return for his testimony where the record was void of any evidence that an agreement had been reached at the time of the witness' testimony which was not disclosed to jury).

Tyler has failed to demonstrate that the Nebraska Supreme Court's adjudication of this claim either resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, or that it resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. Consequently, Tyler is not entitled to habeas relief on Claim Two pursuant to 28 U.S.C. § 2254(d).

## V.  CERTIFICATE OF APPEALABILITY

A petitioner cannot appeal an adverse ruling on his petition for writ of habeas corpus under 28 U.S.C. § 2254 unless he is granted a certificate of appealability. 28 U.S.C. § 2253(c)(1); 28 U.S.C. § 2253(c)(2); Fed. R. App. P. 22(b)(1). The standards for certificates (1) where the district court reaches the merits or (2) where the district court rules on procedural grounds are set forth in *Slack v. McDaniel*, 529 U.S. 473, 484-85 (2000). The court has applied the appropriate standard and determined that Tyler is not entitled to a certificate of appealability.

IT IS THEREFORE ORDERED that the Petition for Writ of Habeas Corpus (filing 1) is denied and dismissed with prejudice. No certificate of appealability has been or will be issued. Judgment will be issued by separate document.

Dated this 21st day of August, 2020.

BY THE COURT:

*Richard G. Kopf*

Richard G. Kopf
Senior United States District Judge